UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
03-CV-3510(JMR/FLN)

James Schneider, Trustee for ）
the Next of Kin of Barbara     ）
Schneider                      ）
                               ）                    ORDER
            v.                 ）
                               ）
City of Minneapolis et al.     ）


This case arises from tragic events which occurred when Minneapolis police officers confronted a seriously disturbed, knife-wielding woman. In the ensuing events, the woman died of police gunfire. The trustee of the decedent's estate claims the City of Minneapolis and its police officers deprived the woman of her constitutional rights during those events. Defendants seek summary judgment. For the reasons set forth herein, defendants' motion is granted.

I.  Factual Background[1]

On July 12, 2000, at 10:28 p.m., a Minneapolis police dispatcher received a call reporting loud music at an apartment across the alley from 3129 Holmes Avenue South. The caller said the person playing the music exhibited "strange behavior, was possibly a threat to herself and was possibly mentally ill." (Palmer Depo. 21-23).

---

[1]As this matter has been considered pursuant to Rule 56 of the Federal Rules of Civil Procedure, the facts are either agreed to, or, when disputed, considered in the light most favorable to plaintiff.

Officers Hawes and Parker, while on patrol, received this dispatch at 10:37 p.m.  Two minutes later, at 10:39 p.m., the dispatcher received a second call.  The caretaker at 3120 Hennepin Avenue South requested a special police squad able to assist with a mentally ill resident.  He said Barbara Schneider, the tenant in apartment 304, was disturbing people, drawing on the walls, littering the hallway, knocking on doors, and playing loud music. He indicated the police should contact him in apartment 206, so he could explain the situation.

Officers Parker and Hawes arrived at 3129 Holmes Avenue South in response to the first call and located the person who had called in the complaint.  She directed the Officers to the rear of the apartment building located at 3120 Hennepin Avenue South.  She pointed to the window from which the loud noise was coming.  She told the Officers she had seen the woman in the window dancing, yelling, screaming, and making motions with her hands, described as the "itsy, bitsy spider" routine.

Officers Parker and Hawes entered 3120 Hennepin using the rear stairway.  Upon reaching the third floor, they observed another woman standing in front of apartment 303.  The woman pointed to apartment 304.  The Officers did not ask her any questions, but directed her to return to her own apartment.

Officer Parker then approached the door to apartment 304 and knocked.  His announcement that police officers were present

2

elicited no response.  He repeated this announcement twice more.
Again, there was no response.  The radio in the apartment was so
loud the Officers questioned whether the occupant could hear their
knocks and announcements.  Faced with this situation, Officer
Parker opened the apartment door and yelled "Police!"

Through the open door, Officer Parker saw Barbara Schneider.
She appeared to have a startled look; she yelled something about
Satan and came toward him with a long knife.  He quickly shut the
door and held it closed to keep the woman from attacking him or his
partner.  Officer Hawes then radioed for assistance, saying they
had an out of control female with a knife.

Ms. Schneider repeatedly attempted to open the door, while
Officer Parker held it shut.  In an effort to fend her off, the
Officers tried to get her away from the door, and out of a position
where she could attack them.  To do so, they sprayed mace through
the crack in the door.  Ms. Schneider immediately began coughing,
and the Officers no longer felt resistance on the other side of the
door.

As these events evolved, other officers began to arrive in
response to Officer Hawes' radioed request for assistance.
Officers Saarela and Illetschko arrived first, meeting Officers
Parker and Hawes in front of apartment 304.  Officers Parker and
Hawes explained what had happened.  The Officers still could not
hear or feel Ms. Schneider on the other side of the door, so they

decided to slowly open the door to check the apartment.

Upon opening the door, none of the four officers saw anyone. They did, however, hear Ms. Schneider yelling and saw shadows beneath the bedroom door. The bedroom was located at the back of the apartment, down a hallway from the main door. Officer Saarela went to the bedroom door and asked Ms. Schneider to please come out so the officers could talk to her. Officer Saarela testified that she did not advise the other officers of her plan, but she intended to talk Ms. Schneider into going with them to a hospital crisis ward. (Saarela Depo. 114-18.) During this time, Ms. Schneider was ranting and raving in a nonsensical fashion, and Officer Saarela could tell she was very agitated and angry.

When Ms. Schneider did not come out of the bedroom, the officers left the apartment. At that point, Officers Palmer and Johnson arrived on the scene and were briefed on the situation.

None of the officers were aware of the second 911 call saying Barb Schneider was mentally ill, was disturbing other residents, and police should see the caretaker first. The message had been transmitted at 11:49 p.m. using the department's Mobile Data Terminal ("MDT") message system. Officers Parker and Hawes were already on the scene when the MDT transmission occurred. Officers Saarela and Illetschko, responding to their fellow officers' call for assistance, simply glanced at the MDT before leaving their squad car. They had seen the message about the initial

4

disturbance, knew they were backing up Officers Parker and Hawes, but did not see the message about contacting the caretaker first. Officers Johnson and Palmer received the MDT transmission while in their squad car, but neither officer recalls seeing the "check the welfare" message.

Regardless of the MDT message, each officer clearly recognized that this woman was highly disturbed.  Another woman in a nearby apartment reported hearing one officer say while exiting the apartment, "she's fucking nuts and she's not making any sense." (Meshbesher Aff., Ex. 3 at 5, Ex. 4 at 3.)  The officers understood the woman was either mentally ill or high on drugs.  Each knew she needed to be dealt with very carefully.

The officers briefly discussed what to do next.  Officer Palmer testified that one officer said, "Let's do a containment and . . . open the [bedroom] door and try to figure out what's going on in there." (Palmer Depo.  74, 78.)  The officers did not discuss what to do if the woman still had the knife and wouldn't drop it. Officer Parker was selected to open the bedroom door; the others followed with their weapons drawn.  Officer Parker kicked open the bedroom door and then retreated through the exterior door to the hallway.

At that point, Officers Palmer and Saarela were standing four to five feet from the bedroom door.  Officers Parker and Illetschko were directly behind them.  The Officers saw Ms. Schneider holding

some type of cloth over her mouth.   She crouched over her bed, about eight feet from the bedroom door.   In her right hand, she held the knife over her head.   Officer Palmer said she had a blank stare in her eyes and began to laugh in an unusual manner, stating, "I see they sent the Satan squad tonight," (Palmer Depo. 80), calling the police "Nazis and pigs." (Id. at 130).

Ms. Schneider then took several steps toward the door and brought the knife waist-level, parallel to the floor.   The officers repeatedly told her to drop the knife, but she refused to do so. When she advanced to the bedroom doorway, Officers Saarela and Palmer shot simultaneously.   Officer Saarela fired four times, and Officer Palmer six.   The shooting lasted one to three seconds.   Ms. Schneider died of gunshot wounds.

Officer Saarela retired from police work shortly after these events.   At her deposition, she said she was critical of the lack of police training in dealing with armed mentally ill people. (Saarela Depo. 102.)   Although she had been trained to deal with the mentally ill through her employment in the Minnesota Department of Corrections, (Id. at 19-20), Officer Saarela said she did not receive such training in the Police Academy or upon entry into police service.   (Id. at 26).

At the time in question, the officers' only training was to use deadly force in situations involving any person advancing on the officers with a weapon. (Id. at 143.)   Minneapolis police had

6

previously used deadly force when confronting mentally ill persons – one was two years, and the other several months before the Schneider incident.  (Id. at 142.)  Officer Saarela testified to her belief that "Minneapolis had every opportunity to implement a critical incident team and less than lethal use of force." (Id.)

Plaintiff's response to the motion for summary judgment includes the affidavit of Robert J. diGrazia, a police practices expert.  In Mr. diGrazia's opinion, the officers' actions were objectively unreasonable.  According to Mr. diGrazia, "all evidence points to unprofessional action dealing with an emotionally disturbed person and the extraordinary . . . excessive use of deadly force." (diGrazia Aff. 3, 5.)  He attributes the officer's behavior to ". . . a complete lack of required training, sufficient written directives, proper direction and required supervision" on the part of the City of Minneapolis.  (Id. at 3).

II.  <u>Claims</u>

Plaintiff James Schneider, trustee for Ms. Schneider's heirs and next of kin, brings a claim pursuant to 42 U.S.C. § 1983. Plaintiff claims defendants' use of deadly force violated Barbara Schneider's constitutional rights.  He also brings state law claims of negligence.  Defendants' motion for summary judgment is premised on their assertion of qualified, official, and statutory immunity.

Plaintiff has voluntarily dismissed his § 1983 and negligence claims against Officers Parker, Hawes, Illetschko, and Johnson.  He

7

further agrees to dismiss his 42 U.S.C. § 1985 conspiracy claim against all defendants.

Plaintiff, in response to the summary judgment motion, offered no evidence to support two sets of claims: those against Chief of Police Robert Olson, and those premised on the Fourteenth Amendment. Plaintiff's brief does not mention either Officer Olson or the Fourteenth Amendment. In the absence of either evidence or argument on these claims, the Court concludes plaintiff has abandoned them. See e.g., Thomsen v. Ross, 368 F. Supp. 2d 961, 974 n. 9 (D. Minn. 2005) (finding plaintiff had abandoned claims which were unaddressed in his response to summary judgment motion).

There remain § 1983 claims against Officer Palmer, Officer Saarela, and the City of Minneapolis; negligence claims also remain against Officer Palmer, Officer Saarela, and the City of Minneapolis.

III. Analysis

Summary judgment is appropriate when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 246 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. See Liberty Lobby, 477 U.S. at 248-49; see also Hartnagel

v. Norman, 953 F.2d 394, 395-96 (8th Cir. 1992).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Liberty Lobby, 477 U.S. at 247-48.  If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted.  See Celotex, 477 U.S. at 322.

A.  42 U.S.C. § 1983

Plaintiff claims the officers' use of deadly force deprived Ms. Schneider of her constitutional rights under color of state law, in violation of 42 U.S.C. § 1983.  "In order to survive a motion for summary judgment under § 1983, a plaintiff must raise a genuine issue of material fact as to whether (1) the defendants acted under color of state law, and (2) the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right."  Kuha v. City of Minnetonka, 365 F.3d 590, 596 (8th Cir. 2003) (amending and substituting opinion filed May 8, 2003) (quoting Cooksey v. Boyer, 289 F.3d 513, 515 (8th Cir. 2002)).

1.  Officers Palmer and Saarela

Officers Palmer and Saarela claim they are entitled to qualified immunity.  Qualified immunity shields police officers from suit for official acts as long as their conduct "does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). An officer's entitlement to qualified immunity is a question of law which the Court should decide "at the earliest possible stage of litigation." <u>Gorra v. Hanson</u>, 880 F.2d 95, 97 (8th Cir. 1989).

To reach this decision, the Court must first inquire whether "the facts alleged show the officer's conduct violated a constitutional right." <u>Saucier v. Katz</u>, 533 U.S. 194, 201 (2001). If the alleged facts establish a violation, the Court next considers whether that conduct was objectively unreasonable according to clearly established law. <u>Id.</u> An individual may only claim qualified immunity if both conditions are met. On the facts alleged in this case, the Court finds plaintiff has failed to establish a violation of Ms. Schneider's constitutional rights; accordingly, there is no need to consider the objective reasonableness of the officers' actions. <u>See</u> <u>Id.</u>

Claims that officers used excessive force during the seizure of a free citizen are analyzed under the Fourth Amendment. <u>Graham v. Connor</u>, 490 U.S. 386, 394-95 (1989). This includes seizure by use of deadly force. <u>Tennessee v. Garner</u>, 471 U.S. 1, 7 (1985). In evaluating excessive force claims, the test is one of objective reasonableness. <u>Graham</u>, 490 U.S. at 397.

10

The "'reasonableness' of the force must be judged from the perspective of a reasonable officer on the scene." Graham, 490 U.S. at 396.  The Court must make "allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 397.  Officers in the heat of the moment do not have the benefit of 20/20 hindsight or the careful reflection afforded a judge in the peace of his or her chambers. Id. at 396.  Before an officer's actions amount to a constitutional violation, that officer's use of force must be objectively unreasonable under clearly established law, taking into account the specific circumstances of the seizure.  Saucier, 533 U.S. at 205. The Eighth Circuit Court of Appeals recognizes that an individual's "emotionally disturbed status may be relevant to the . . . determination of objective reasonableness." Ludwig v. Anderson, 54 F.3d 465, 472 (8th Cir. 1995).

Clearly, the "intrusiveness of a seizure by means of deadly force is unmatched." Garner, 471 U.S. at 9.  Nonetheless, an officer may use deadly force if he or she has probable cause to believe the individual "poses a significant threat of death or serious physical injury to the officer or others." Hernandez v. Jarman, 340 F.3d 617, 622 (8th Cir. 2003).

11

Plaintiff claims Officer Palmer's and Saarela's use of deadly force on Ms. Schneider was objectively unreasonable.  He claims the officers voluntarily threw themselves into harms way when they entered Ms. Schneider's apartment.  Building on this thesis, he claims it was the officers who created the need to use deadly force.  According to plaintiff, the officers knew or should have known of Ms. Schneider's emotional instability, and should have handled the situation differently -- in a fashion which would "de-escalate" the situation.  Plaintiff is incorrect.

"The Fourth Amendment prohibits unreasonable seizures, not unreasonable or ill-advised conduct in general." Cole v. Bone, 993 F.2d 1328, 1333 (8th Cir. 1993).  The Eighth Circuit considers only whether the seizure, itself, was reasonable; it does not look into the events leading to the seizure.  Id.  Plaintiff urges this Court to turn from the Eighth Circuit's rule, arguing that Cole v. Bone did not involve the seizure of a mentally ill person.  993 F.2d 1328.  Plaintiff claims this Court should read Ludwig v. Anderson, 54 F.3d 465, to require scrutiny of the events leading to the seizure, as well as the seizure itself, when considering cases involving the mentally ill.  Setting aside the fact that this Court is bound to follow Eighth Circuit law, plaintiff misapprehends the holding in Ludwig.

The Court recognizes that Ludwig found an individual's mental state relevant in determining the amount of force used.  But the

Ludwig court applied the Cole standard when scrutinizing the seizure. In Ludwig, police arrived to aid an emotionally disturbed man. They found a disturbed and agitated man, and their actions apparently caused him to run from the officers. In considering the police actions, the court analyzed only the reasonableness of the seizure itself. 54 F.3d at 471 ("the district court should scrutinize only the seizure or seizures themselves, not the events leading to them"). The court held the material fact question was "whether Ludwig's actions *at the time of the shooting* . . .' pose[d] a threat of serious physical harm.'" Id. at 473 (quoting Garner 471 U.S. at 11-12) (emphasis added).

The Eighth Circuit applied Cole again in Schulz v. Long, 44 F.3d 643, 648 (8th Cir. 1995). In Schulz, officers arrived and found a paranoid schizophrenic barricaded in the basement of his parents' home. One officer became entangled when attempting get past the barricade to subdue the man. At that point, the psychotic man advanced upon the officer with a double-bladed ax. Another officer called a warning, which went unheeded. As the man advanced, the warning-officer shot and killed the man. As in Cole, the Eighth Circuit analyzed the seizure itself, and not its elaborate prelude. Schulz, 44 F.3d at 647-48.

Thus, this Court will analyze the information the officers possessed when they chose to use deadly force. Whether they "created the need to use force by their actions prior to the moment

13

of seizure is irrelevant." <u>Schulz</u>, 44 F.3d at 649.

The first officers responded to a citizen complaint of a woman acting strangely; the others arrived in response to an assistance call from their fellows on the scene. The only "notice" of Ms. Schneider's mental state was the unheeded MDT transmission. Their inattention to that message is entirely understandable: The MDT had not been sent when Palmer and Hawes arrived; the others were responding to their call for help. The luxury of time to peruse an electronically transmitted message was not available to them. This did not mean they were unaware that she was deeply disturbed; that fact was obvious on the scene.

Even acknowledging her condition, however, "[k]nowledge of a person's disability simply cannot foreclose officers from protecting themselves . . . when faced with threatening conduct by the disabled individual." <u>Bates v. Chesterfield County</u>, 216 F.3d 367, 372 (4th Cir. 2000). Ms. Schneider advanced on the officers with a knife. Officers Palmer and Saarela feared for the safety of their fellow officers as well as their own. Given the facts known to the officers, in the face of an epithet-screaming woman advancing on them with a knife, the Court finds the officers' use of deadly force was objectively reasonable, as a matter of law. As such, there was no constitutional violation. Officers Palmer and Saarela are entitled to qualified immunity and summary judgment.

14

2. <u>City of Minneapolis</u>

Plaintiff claims the City of Minneapolis ("the City") is liable for failing to develop a policy and failing to train its officers in dealing with mentally disturbed individuals. Municipalities may be liable for constitutional wrongs caused by their failure to adequately train officers, if the failure to train rises to the level of deliberate indifference to the individual's rights. <u>Larkin v. St. Louis Hous. Auth. Dev. Corp.</u>, 355 F.3d 1114, 1117 (8th Cir. 2004). While this is so, the sine qua none of any § 1983 claim is an underlying constitutional violation. <u>Cole</u>, 993 F.2d at 1334; <u>Schulz</u>, 44 F.3d at 650.

"A municipality 'cannot be liable . . . whether on a failure to train theory or a municipal custom or policy theory, unless [an officer] is found liable on the underlying substantive claim.'" <u>Brown v. City of Bloomington</u>, 280 F. Supp. 2d 889, 894 (D. Minn. 2003) (quoting <u>Abbott v. City of Crocker</u>, 30 F.3d 994, 998 (8th Cir. 1994)). Here, the Court holds that no constitutional violation occurred. Thus, this claim fails as a matter of law. In the absence of a deprivation of constitutional rights, there can be no municipal liability.

B. <u>Negligence</u>

The elements of a negligence claim are well established. "'The basic elements of a negligence claim are (1) a duty; (2) a breach of that duty; (3) that the breach of duty be the proximate

cause of plaintiff's injury; and (4) that plaintiff did in fact suffer an injury.'"  Hudson v. Snyder Body, Inc., 326 N.W.2d 149, 157 (Minn. 1982) (quoting Schmanski v. Church of St. Casimir of Wells, 67 N.W.2d 644, 646 (Minn. 1954)).  Plaintiff claims negligence on the part of Officers Palmer, Saarela, and the City of Minneapolis caused Ms. Schneider's death.  Plaintiff's negligence claim rests on Minnesota state law, and is before the Court under its supplementary jurisdiction.

### 1.  Officers Palmer and Saarela

The Officers claim they are entitled to official immunity. Official immunity shields Minnesota governmental officials from liability for discretionary acts performed in the course of employment.  See Janklow v. Minnesota Bd. of Exam'rs for Nursing Home Adm'rs, 552 N.W.2d 711, 716 (Minn. 1996).  Official immunity is a question which may be resolved on summary judgment.  Reuter v. City of New Hope, 449 N.W.2d 745, 751 (Minn. App. 1990).

Minnesota law considers the decision to use deadly force to be a discretionary function entitling a police officer to official immunity, absent a willful or malicious wrong.  Maras v. City of Brainerd, 502 N.W.2d 69, 77 (Minn. App. 1993).  Malice is "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right."  Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991) (quoting Carnes v. St. Paul Union Stockyards Co., 205 N.W. 630, 631 (Minn.

16

1925)).   Willful and malicious are synonymous in the official immunity context.  <u>Id.</u>

Plaintiff claims the officers knowingly, recklessly, and unreasonably put themselves in danger by entering Ms. Schneider's apartment without a plan to avoid putting themselves or Ms. Schneider in danger.  The flaw in plaintiff's argument lies in the fact that:

> the willful or malicious wrong exception to official immunity . . . does not impose liability merely because an official *intentionally* commits an act that a court or a jury subsequently determines is a wrong.  Instead, the exception anticipates liability only when an official intentionally commits an act that he or she then has reason to believe is prohibited.

<u>Id.</u> (emphasis in original).   This claim is premised on the identical facts set forth above.  On those facts, there is no basis upon which a reasonable jury could find the officers intentionally violated Ms. Schneider's rights.  Similarly, there is no evidence in this case from which a reasonable jury could find malice by a preponderance of the evidence.

2.  <u>The City of Minneapolis</u>

The City claims it is entitled to statutory immunity which protects the separation of powers by preventing the judicial branch from reviewing executive and legislative branch policy decisions.  <u>Killen v. Indep. Sch. Dist. No. 706</u>, 547 N.W.2d 113, 116 (Minn. App. 1996).  Minnesota law bars municipal liability for "any claim based on the performance or the failure to exercise or perform a

17

discretionary function or duty, whether or not the discretion is abused." Minn. Stat. § 466.03, subd. 6 (2004). Minnesota's legislature has shielded cities from tort liability for planning decisions that involve public policy, as opposed to day-to-day operational decisions. Holmquist v. State, 425 N.W.2d 230, 231-232 (Minn. 1988).

A court engages in a two-step process when determining whether statutory immunity applies. Christopherson v. City of Albert Lea, 623 N.W.2d 272, 275 (Minn. App. 2001). A court first determines which governmental conduct is challenged, and then, whether that conduct is operational or policy-making. Id. Critical to the second question is "whether the specific governmental conduct at issue involves the balancing of policy objectives." Norton v. County of Le Sueur, 565 N.W.2d 447, 450 (Minn. App. 1997).

According to plaintiff, Minneapolis is liable for failing to properly train, supervise, and educate the police officers to prevent excessive force in dealing with the mentally ill. Plaintiff argues the City is not entitled to statutory immunity because it failed to enact a policy in this regard. Plaintiff relies on S.W. v. Spring Lake Park Sch. Dist. 16, where the Minnesota Supreme Court held the legislature did not intend to "immunize government entities for their failure to put policies in place." 580 N.W.2d 19, 23 (Minn. 1998).

18

Plaintiff's reliance on S.W. is misplaced.  That case involved school security policies.  This case involves police training.  The Minnesota Court of Appeals has ruled that a municipality's decisions regarding the training of its police officers are protected by statutory immunity.  Maras, 502 N.W.2d at 78.  "We agree that the training a city provides to its police officers is a policy decision.  The city must decide what kinds of training the officers need and must take into account the resources the city has to pay for such training."  Id.  The City of Minneapolis has trained its police for many years.  While it has not provided specialized training in handling mentally disturbed individuals, this fact is not material to this decision.

Here, there is no question the officers knew they were confronting a deeply disturbed person.  Their attempts to reach her ended when she turned on them with a knife.  This is the kind of split-second decision officers must make.  The City's discretionary decisions concerning the exact courses it provided its police officers are entitled to official immunity under Minnesota law.  As such, the City of Minneapolis is protected by statutory immunity and summary judgment is granted on this claim.

III.  Conclusion

The Court, having found defendants entitled to immunity, grants their motion for summary judgment.  Accordingly, this matter is dismissed with prejudice.

19

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: June <u>30</u>, 2006

<u>s/James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States Chief District Judge